[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
{¶ 1} This is an appeal by defendant-appellant, James W. Harrison, D.V.M., from a judgment of the Franklin County Court of Common Pleas, overruling appellant's objections to decisions of a magistrate and adopting the magistrate's decisions finding in favor of plaintiff-appellee, William D. DeHoff, D.V.M., on issues of liability and damages arising out of proceedings for dissolution of a corporation.
 {¶ 2} This case involves a lengthy dispute between appellee and appellant, both veterinarians, regarding their interests in two close corporations, Veterinary Hospital Operations of Central Ohio, Inc. ("VHOCO"), and MedVet, Inc. ("MedVet"). On July 29, 1993, appellee filed a complaint for judicial dissolution, pursuant to R.C. 1701.91(A)(4), naming as defendants VHOCO and MedVet, and seeking dissolution of the two above-named Ohio corporations. The complaint alleged that appellee was the owner of one-half of the issued and outstanding common stock of VHOCO and MedVet, as well as a director and officer of the corporations, and that appellant was also the owner of one-half of the issued shares of VHOCO and MedVet.
 {¶ 3} It was alleged that a "significant deadlock" had developed concerning the management of the two corporations, and the role of appellant. Specifically, in July 1993, appellee and appellant, accompanied by their respective counsel, had met during special meetings for the purpose of considering the removal of appellant as a director and officer of both VHOCO and MedVet. During the meetings, appellee voted in favor of certain resolutions presented, while appellant voted in opposition to them. Appellee and appellant also considered a separate resolution calling for dissolution of the corporations, but this resolution also failed for lack of a majority vote.
 {¶ 4} On September 3, 1993, appellant filed with the trial court a motion to intervene. The trial court subsequently issued a decision sustaining appellant's motion to intervene, and appellant filed an answer on November 15, 1993.
 {¶ 5} On December 6, 1993, the trial court ordered the judicial dissolution of the two corporations. The court designated appellant and appellee, as directors of the corporations, to handle the liquidation and winding up. During this time, appellee created a new professional corporation, William D. DeHoff Associates, Inc., and appellee submitted a written offer to VHOCO to purchase the tangible personal property, hospital supplies and trade name of MedVet, in exchange for assumption of bank obligations to Society National Bank ("Society") in the amount of approximately $37,000.
 {¶ 6} On December 15, 1993, appellee, as secretary of VHOCO, sent notice of a special meeting of the board of directors of VHOCO for the purpose of "consider[ing] an offer to purchase certain assets, and assume certain liabilities, submitted to the corporation by DeHoff 
Associates, Inc." (Plaintiff's Exhibit F.) Both appellant and appellee met on December 20, 1993, to consider appellee's offer and to discuss matters regarding winding up of the corporations. Also present at the meeting were C. Bernard Brush, counsel for appellant, Harry J. Lehman, counsel for appellee, and John Casey, counsel for VHOCO.
 {¶ 7} The primary dispute in this litigation involves whether the parties reached an agreement on that date, appellee contending that an agreement was made while appellant denied its existence. On the following day, December 21, 1993, attorney Lehman sent the parties "a draft of the Agreement between and among Veterinary Hospital Operations of Central Ohio, Inc. dba MedVet, MedVet, Inc., James W. Harrison, D.V.M., and William D. DeHoff, D.V.M., reflecting the agreements reached at the meeting at our office on Monday, December 20, 1993." (Plaintiff's Exhibit I.) Lehman further indicated in the letter that he would be forwarding the corporate resolutions prepared by Casey for execution at the same time. Neither party ever signed a copy of the agreement drafted by Lehman.
 {¶ 8} By March 1994, the Society loans, which were secured by interests in the corporations' tangible personal property and assets, were in default. Society took a judgment against VHOCO, as well as against appellant and appellee personally as guarantors of the notes.
 {¶ 9} In August 1994, counsel for appellant filed a motion to appoint a receiver. On October 20, 1994, various veterinarians that had been in the employ of VHOCO filed verified claims against MedVet, VHOCO, appellee and appellant. On December 9, 1994, the trial court granted appellant's motion for an appointment of a receiver. By entry filed March 10, 1995, the trial court ordered that the assets of the corporations at issue be inventoried and appraised, and thereafter sold at public auction.
 {¶ 10} In March 1995, appellant filed a verified claim against MedVet, VHOCO and appellee. Appellant sought compensatory damages for alleged unauthorized use of appellant's interest in the corporate assets, as well as damages for professional fees, loans, guarantees, and payments to creditors of VHOCO and MedVet.
 {¶ 11} On May 26, 1995, appellee filed a verified claim against MedVet, VHOCO and appellant. Appellee alleged that appellant had breached an agreement made with appellee on December 20, 1993, including the failure to transfer title and possession of certain assets to appellee, and the failure to pay a $10,000 obligation to be applied toward the liabilities and obligations of the corporations. Appellee also alleged that appellant breached his fiduciary duty with respect to the liquidation and winding up of the affairs of the corporations, and that appellant had converted to his own use and benefit certain payments from patients of VHOCO due and payable to VHOCO. Appellee sought compensatory damages as well as attorney fees.
 {¶ 12} On October 10, 1996, the receiver filed a final report and application for authority to approve the sale of certain assets. The trial court subsequently approved the final report.
 {¶ 13} On September 18, 1998, appellee filed a motion for summary judgment, dismissal and/or judgment on the pleadings in the verified claim of appellant. Appellant filed a memorandum contra appellee's motion. By decision filed October 29, 1998, the trial court granted appellee's motion for judgment on the pleadings, and also granted appellee's motion for summary judgment and motion to dismiss. On November 13, 1998, appellant filed a Civ.R. 60(B) motion for relief from judgment. The trial court rendered a decision on December 1, 1998, granting appellant's motion for reconsideration (captioned as a motion for relief from judgment), and granting appellee's motions for judgment on the pleadings, summary judgment and to dismiss.
 {¶ 14} Appellee's claims against appellant were tried before a magistrate of the trial court, who bifurcated the issues of liability and damages for trial. The liability phase of the trial began on May 6, 1999. On January 30, 2000, the magistrate issued a decision, finding that the parties had entered into an agreement on December 20, 1993, and that appellant had breached the agreement. The magistrate determined that appellant was obligated under the agreement for payment of $10,000 to be applied to the obligations and liabilities of the corporations. The magistrate further found that appellant's conduct constituted a breach of fiduciary duty, including conduct designed to thwart the liquidation and sale of assets of the corporations, and conduct inconsistent with the trial court's order to wind up the corporations; the magistrate did not, however, find that appellant had acted with malice.
 {¶ 15} In May 2000, the magistrate heard evidence on the issue of damages. The magistrate rendered a decision on June 5, 2000, finding in part that appellant had acted in bad faith, and that attorney fees were warranted. The magistrate awarded appellee total damages in the amount of $252,637.12.
 {¶ 16} On July 10, 2000, appellee filed objections to the magistrate's decisions, asserting that he was entitled to an award of punitive damages. On August 25, 2000, appellant filed his objections to the magistrate's decisions.
 {¶ 17} By decision rendered on May 25, 2001, the trial court adopted, as modified, the magistrate's decisions of January 31, 2000, and June 5, 2000. As to appellee's objections, the court found no error with the magistrate's determination that, although appellant had acted in bad faith, he had not acted with malice. Accordingly, the trial court declined to consider an award of punitive damages.
 {¶ 18} Regarding appellant's objections, the trial court agreed with the magistrate's determination that the parties entered into a valid and enforceable agreement, that appellee was willing to fulfill his duties under the agreement, and that he did so to the extent possible. The trial court also agreed with the magistrate's finding that appellant breached a fiduciary duty. On the issue of damages, the court adopted the magistrate's determination that appellant was obligated to pay $10,000 under the agreement, and that appellee was entitled to $50,000 in compensatory damages outside of attorney fees. The court also determined that the award of attorney fees to appellee was allowable as compensatory damages for his breach of the agreement and breach of fiduciary duty, and the court awarded total damages in the amount of $269,254.10.
 {¶ 19} On June 8, 2001, appellee filed a motion for prejudgment interest. Appellee also filed a motion for an award of additional compensatory damages, which the trial court subsequently granted. Beginning on January 4, 2002, the trial court conducted a hearing on appellee's motion for prejudgment interest. By entry filed March 20, 2002, the court granted appellee's motion for prejudgment interest.
 {¶ 20} On appeal, appellant sets forth the following twelve assignments of error for review:
 {¶ 21} "[I.] The Trial Court Erred In Determining That The Parties Entered Into A Valid, Enforceable Agreement.
 {¶ 22} "[II.] The Trial Court Erred As A Matter Of Law In Finding That Dr. Harrison Breached The Agreement.
 {¶ 23} "[III.] The Trial Court Erred As A Matter Of Law In Finding That Dr. Harrison Breached A Fiduciary Duty.
 {¶ 24} "[IV.] The Trial Court Erred As A Matter Of Law In Holding That Appellee Could Bring Direct Claims While Utilizing The Same Legal Standard To Dismiss Dr. Harrison's Direct Claims.
 {¶ 25} "[V.] The Trial Court Erred As A Matter Of Law In Finding Dr. Harrison Was Personally Liable For The Liabilities Of The Corporations Where There Was No Finding Of Piercing Of The Corporate Veil.
 {¶ 26} "[VI.] The Trial Court Erred As A Matter Of Law In Allowing Several Legal Actions To Occur In The Course Of A Special Statutory Proceeding.
 {¶ 27} "[VII.] The Trial Court Erred In Denying Dr. Harrison's Motion For Reconsideration Of The Judgments Entered Against Him Immediately Preceding Judge Johnson's Recusal For Conflict Of Interest.
 {¶ 28} "[VIII.] The Trial Court Erred In Determining That $10,000.00 Was Due Pursuant To The December 21, 1993 Agreement.
 {¶ 29} "[IX.] The Trial Court Erred In Awarding Compensatory Damages To Appellee For Loss Of Time And Storage Of Documents.
 {¶ 30} "[X.] The Trial Court Erred In Awarding Attorney Fees Where No Legal Basis Existed For Such An Award.
 {¶ 31} "[XI.] The Trial Court Abused Its Discretion In Awarding Attorney Fees That Were Substantially Greater Than Appellee's Actual Damages, In Failing To Apply The Factors Contained In DR 2-106, And In Awarding Attorney Fees For Work Performed On Behalf Of Persons Other Than Appellee.
 {¶ 32} "[XII.] The Trial Court Erred In Awarding Prejudgment Interest."
 {¶ 33} Appellee has filed a cross-appeal, asserting the following single assignment of error for review:
 {¶ 34} "In the March 25, 2002 Judgment Entry journalizing, inter alia, the Decision Adopting, As Modified, The Magistrate's Decisions of January 31, 2000 and June 5, 2000, filed May 29, 2001, the trial court erred by failing to award punitive damages against Defendant/Appellant/Cross-Appellee James W. Harrison."
 {¶ 35} Appellant's first and second assignments of error are interrelated and will be considered together. Under these assignments of error, appellant asserts that the trial court erred in determining that the parties entered into a valid, enforceable agreement, and in finding that appellant breached the agreement. Appellant further contends that, even assuming the existence of an enforceable agreement, it did not comply with Ohio's Statute of Frauds, R.C. 1302.04, concerning contracts for the sale of goods greater than $500.
 {¶ 36} Appellant's primary contention is that the evidence indicates the parties never reached an agreement for the sale of assets and assumption of liabilities of MedVet and VHOCO. Appellant argues that appellee failed to produce an agreement that was signed by the parties, and further asserts that correspondence between the parties' counsel, exchanged after the December 20, 1993 meeting, demonstrates that both sides were still attempting to reach an agreement long after the meeting. Appellant also argues that appellee's conduct subsequent to the December meeting is inconsistent with a finding that an agreement existed. In response, appellee contends that the evidence was sufficient to show that the parties reached a binding agreement on December 20, 1993, regarding the sale of VHOCO, and that such agreement was memorialized in the unexecuted agreement circulated within a day of the December 20 meeting.
 {¶ 37} We begin by reviewing the findings of the magistrate, who ruled in favor of appellee on the issue of formation of an agreement. On December 6, 1993, Dr. James Lehnerd, President of Columbus Veterinary Emergency Service, Inc., VHOCO's landlord, sent appellant and appellee a letter informing them that, as of December 21, 1993, the sublease agreement (which formed the basis of VHOCO's tenancy) was being forfeited because of the dissolution of VHOCO. On December 15, 1993, appellee, as secretary of VHOCO, sent appellant notice of a special meeting of the directors.
 {¶ 38} The meeting was held at a law office on December 20, 1993. During the meeting, an agenda prepared by attorney Lehman was circulated. The magistrate noted that, although accounts of what happened at the meeting vary, "the discussion did center on the Agenda and particularly on the offer made by William D. DeHoff Associates to purchase certain assets of VHOCO, including furniture, fixtures, supplies, and the name `MedVet.'" The magistrate further noted that significant activity had taken place with respect to the civil action filed in July 1993; VHOCO had been dissolved by order of the trial court on December 6, 1993, and the court had ordered the parties to act promptly to liquidate all corporate assets, to resolve all corporate liabilities and to wind up the affairs of both corporations. The magistrate observed that "there was, or should have been, some sense of urgency in what was occurring."
 {¶ 39} The magistrate, upon consideration of the conflicting testimony of the parties, rendered the following findings:
 {¶ 40} "* * * Dr. Harrison testified that as far as he was concerned, there was no `agreement' reached between the parties on December 20, 1993. He notes, for example, that Mr. Lehman, as counsel for Dr. DeHoff, sent a `draft' of the Agreement the next day. Further, he indicates that there were a number of issues not resolved at that meeting, so that an agreement could not have been said to have been reached.
 {¶ 41} "Dr. Harrison's testimony, however, is considerably different from that of John Casey, counsel for the corporation. Mr. Casey testified that the items on the agenda for the December 20, 1993 meeting were discussed in detail, and that the negotiations went back and forth throughout the meeting. The two doctors handled most of the discussion. At the end, both doctors stated, `We have an agreement.' They then shook hands. Mr. Casey added that he reviewed Exhibit H, which was Attorney Lehman's write-up of the Agreement, and found it to conform completely with the verbal agreement reached the previous evening.
 {¶ 42} "This Magistrate finds the testimony of Mr. Casey to be highly credible.
 {¶ 43} "There are numerous reasons for accepting Mr. Casey's version of events, and rejecting Dr. Harrison's. First, Mr. Casey had no financial stake in the outcome, whereas Dr. Harrison did. Second, this Magistrate is somewhat skeptical of Dr. Harrison's actions during this time. This skepticism is based on the fact that time was of the essence, and getting the corporate affairs wound up quickly was important, and was perceived as such. What this Magistrate believes, based on the evidence submitted, is that Dr. Harrison did enter into an agreement with Dr. DeHoff on the evening of December 20, 1993. Further, that the agreement reached is exactly as expressed in Exhibit H. But sometime after the meeting, this Magistrate believes that Dr. Harrison concluded that he was not getting a fair deal. In essence, Dr. DeHoff was keeping the MedVet name and was working out of the same office where they had both been working since 1988. On the other hand, Dr. Harrison had to open a new office, obtain a new telephone number, and, in short, do a lot more to keep his veterinary practice going, than Dr. DeHoff did. (Footnote omitted.)
 {¶ 44} "The evidence also indicated that both Dr. DeHoff and Dr. Harrison tried to get a number of the veterinarians who had worked with and for them at VHOCO to join one or the other. Dr. Harrison's proposal was not accepted by those veterinarians; most of them did choose to join Dr. DeHoff Associates.
 {¶ 45} "In essence, this Magistrate believes that Dr. Harrison came to two conclusions. First, that the agreement reached on December 20th was simply not fair to him. Second, that he should, and perhaps could, get a better deal than that. It seems very strange to this Magistrate that Dr. Harrison did nothing to ascertain the status of the preparation of the writing of the agreement for so many days, when time was of the essence. Further, his next actions, according to the record, were to talk to Mr. Lehman and to engage co-counsel, both with the purpose of trying to get a better deal. This Magistrate believes that rightly or wrongly, Dr. Harrison ultimately felt hurt, betrayed, and shortchanged by what had occurred up to and including the December 20th meeting.
 {¶ 46} "Nonetheless, there was an agreement reached on December 20th, 1993. That agreement was quickly reduced to writing, and the credible testimony of Mr. Casey is that `the writing was the agreement' reached the previous evening. * * *"
 {¶ 47} It is well-settled that "[t]he existence of a contract is dependent upon an offer, an acceptance and consideration." Renaissance Technologies, Inc. v. Speaker Components, Inc., Summit App. No. 21183, 2003-Ohio-98. Further, "there must be mutual assent or a `meeting of the minds' as to the offer and acceptance." Id., at ¶ 15.
 {¶ 48} In Rudd v. Online Resources, Inc. (June 18, 1999), Montgomery App. No. 17500, the court noted:
 {¶ 49} "* * * [T]he issue of whether a contract exists raises a mixed question of fact and law. McSweeney v. Jackson (1996),117 Ohio App.3d 623, 632 * * *. An appellate court may freely review application of the law to the facts. Id. It must, however, show deference to the factual findings made by the trial court. Where there are factual disputes, it is generally the province of the trial court to resolve those disputes by weighing credibility of the proffered testimony. Id."
 {¶ 50} Upon review, although there was conflicting testimony, we conclude that there was credible evidence presented that, if believed, supports the magistrate's finding that, during the December 20, 1993 meeting, appellant and appellee agreed to all the essential terms of the sale of the corporations, and that appellant subsequently declined to sign it, seeking instead to obtain more favorable terms. The magistrate specifically found the testimony of Casey to be more credible than appellant's testimony in concluding that appellee and appellant reached an agreement, and that both manifested objective indications of their intent to be bound at the December 20 meeting. According to the testimony of Casey, during the meeting appellee agreed to assume the liabilities of VHOCO, and appellant agreed to contribute $10,000 to pay the debts of VHOCO subject to a credit; further, appellee and William DeHoff 
Associates reached an agreement on the payment of liabilities, including the assumption of the Society loans and the winding up of the affairs of the corporations.
 {¶ 51} The record indicates that, at one point during the discussions, Harrison's counsel, C. Bernard Brush, had to leave the meeting to attend a wake or funeral. Casey testified that attorney Lehman asked Brush if he wanted the parties to suspend talks, but Brush stated that he wanted them to "carry on and get this thing completed." (Tr. Vol. III, at 15.) According to Casey, at the time Brush left, "substantial agreement" had been reached between the parties. (Tr. Vol. III, at 17.) The meeting probably lasted only one half hour after Brush left, and the parties discussed such issues as "when are we going to formally close down operations of VHOCO and MedVet, and they decided the next day." (Tr. Vol. III, at 18.) The parties also discussed who was going to prepare the memorialization of the agreement and prepare the corporate minutes. At the end of the meeting, attorney Lehman asked, "[d]o we have an agreement? And they said, yes. And they shook hands." (Tr. Vol. III, at 20.)
 {¶ 52} The next day, Casey received a copy of the agreement from counsel for appellee. According to Casey, the agreement conformed in all respects with the agreement and understandings that had been reached the previous day by appellee and appellant; Casey testified that appellee and appellant "both committed to each other that this agreement was as set forth in the document, that they had just agreed to it." (Tr. Vol. III, at 52-53.) In accordance with the discussions of December 20, Casey prepared corporate resolutions following the meeting that he then submitted to the parties.
 {¶ 53} On the issue of whether the agreement contained all the essential elements of the agreement, Casey stated that all of the issues that ultimately ended up in the written document were discussed during the meeting, and that appellant and appellee agreed on those issues as they were raised "piece by piece" throughout the meeting. (Tr. Vol. III, at 19.) Casey's testimony corroborated the testimony of appellee, who similarly stated that, during the December 20 meeting, the board members approved the offer of William DeHoff Associates, under which the hospital equipment, furniture, fixtures, office supplies, pharmaceuticals, personal property and other inventory of VHOCO were to be sold, as well as the trade name MedVet. The magistrate noted that there was, or should have been, a strong urgency by both appellant and appellee to reach an agreement based upon the trial court's order of December 6, 1993, requiring the parties to dissolve the corporations. There was testimony that, at the end of the meeting, both sides indicated that they had reached an agreement. Further, based upon the understanding reached at the December 20, 1993 meeting, counsel for appellee prepared a written agreement that he presented to the parties the next day. Casey described the document as a "memorialization of the agreement" appellant and appellee reached the day before and, according to Casey, that agreement set forth all of the terms agreed upon during the meeting. (Tr. Vol. III, at 31.)
 {¶ 54} Although the testimony by appellant and appellee as to the negotiations on December 20, 1993 was conflicting, the trier of fact was not limited to just their versions of what transpired at the meeting. But, see, Dechellis v. Rakoff (Sept. 26, 2001), Mahoning App. No. 00-CA-156 ("[t]he testimony of a single witness can be sufficient to establish the existence of an oral contract"). Rather, as discussed, the magistrate also heard the testimony of an independent witness, Casey, who attended the meeting and fully corroborated appellant's account. While appellant presented evidence contrary to appellee's theory of an agreement, including testimony that material terms remained to be negotiated, the magistrate's findings involved a credibility evaluation of the witnesses, and it is clear from the record that the magistrate found appellant's version of the events to be less than credible. The resolution as to questions of credibility of witnesses is a matter within the province of the trier of fact. State v. DeHass (1967),10 Ohio St.2d 230, paragraph one of the syllabus. Here, whether credible evidence was presented to corroborate appellee's claim that an agreement was reached was a question of fact to be determined by the magistrate who, having observed the demeanor of the witnesses, accepted testimony indicating that the parties reached an agreement as to all the essential terms, and that the parties expressed an intent to be bound.
 {¶ 55} Appellant contends, however, that appellee has failed to produce any agreement signed by the parties, thereby evincing that no agreement was ever reached. However, "[p]arties to a contract may be bound by their oral agreements although they contemplate executing a final written agreement containing all of the provisions upon which they agreed." Cleveland School District v. Cleveland Teachers Union (1980),68 Ohio App.2d 118, 124 (Patton, J., concurring.) See, also, Ciaramella v. Reader's Digest Assn., Inc. (C.A. 2, 1997), 131 F.3d 320, 322
("parties are free to bind themselves orally, and the fact that they contemplate later memorializing their agreement in an executed document will not prevent them from being bound by the oral agreement"). Further, "[t]he question of whether the parties intended to be bound prior to the execution of the formal written contract is a question of intent and an issue of fact." Cleveland School Dist., supra, at 124.
 {¶ 56} In Antonio Palazzolo Co. v. Sutherland Save-Way Materials Center, Inc. (July 15, 1989), Hamilton App. No. C-880291, the court cited with approval the following language of 1 Restatement of the Law, Contracts (1932) 33, Section 26, as well as Comment a to Section 26:
 {¶ 57} "Mutual manifestations of assent that are in themselves sufficient to make a contract will not be prevented from so operating by the mere fact that the parties also manifest an intention to prepare and adopt a written memorial thereof; but other facts may show that the manifestations are merely preliminary expressions * * *.
 {¶ 58} "* * *
 {¶ 59} "* * * It is possible thus to make a contract to execute subsequently a final writing which shall contain certain provisions. If parties have definitely agreed that they will do so, and that the final writing shall contain these provisions and no others, they have then fulfilled all the requisites for the formation of a contract. * * *"
 {¶ 60} As noted above, Casey testified that the agreement reached by the parties was memorialized in writing and presented to the parties the day after the meeting on December 20, 1993, and that this document reflected the understanding that had been reached. In the instant case, the trier of fact heard testimony regarding the parties' intentions, and the evidence does not require a finding that the parties intended only to be bound following execution of a formal writing.
 {¶ 61} Appellant also contends that the parties' actions following the December 20, 1993 meeting proves that no agreement was reached, including correspondence between the parties and the fact that appellee did not perform certain contractual obligations, including making payment on the Society loans.
 {¶ 62} In response, appellee argues that he performed on the agreement to the extent he was not prevented from doing so by appellant's conduct. Specifically, appellee argues that, in furtherance of the agreement, he: (1) timely provided documents requested by appellant; (2) caused the necessary corporate resolution to be prepared and transmitted; (3) collected VHOCO's outstanding receivables, caused final wages and benefits to be paid to employees, and paid creditors, vendors, suppliers, utilities and government agencies; (4) prepared and distributed a final income summary for December 1993 for each veterinarian affiliated with VHOCO; (5) prepared and transmitted to appellant a financial statement, including an inventory of hospital supplies and pharmaceuticals, and a revised balance sheet of VHOCO, as of January 31, 1994; (6) prepared and filed tax returns for VHOCO for 1993 and 1994; and (7) prepared, maintained and stored the tangible personal property and records of VHOCO, including hospital supplies and pharmaceuticals, until such assets were turned over to the receiver.
 {¶ 63} As to appellee's failure to make payment on the Society notes, appellee argues that appellant erroneously contends the assumption of the Society notes and the issuance of the indemnity were the contractual obligations of appellee; rather, the directors of VHOCO had agreed to sell certain tangible personal property and assets of VHOCO, as well as the trade name "MedVet," to DeHoff Associates, a separate corporate entity. Appellee argues that no arms-length purchaser would have been in a position to assume the Society loans until it received title to the property being acquired and that, as president and treasurer of VHOCO, appellant's signature on a bill of sales for the assets was essential. Appellee maintains that appellant's refusal to execute a bill of sale to DeHoff Associates prevented that entity from assuming the Society loans and delivering an instrument of indemnity to appellant on his guaranty.
 {¶ 64} Regarding correspondence between the parties following the meeting of December 20, 1993, appellee argues that appellant's new counsel made proposals attempting to materially change the fundamental terms of the agreement. Appellee contends that, because the assets and liabilities of the corporation were relatively small, appellee made a good-faith effort over several months, although not legally required, to resolve issues raised by appellant without modifying the fundamental terms of the agreement. Appellee maintains that the fact he tried to appease appellant's efforts to reopen negotiations in an effort to discharge the duties imposed by the court's order of December 6, 1993, to wind up the affairs of the corporations does not undermine the fact that the parties reached an agreement on December 20, 1993.
 {¶ 65} While the evidence is undisputed that appellee did not assume the Society notes as contemplated by the agreement, there is evidence that appellee engaged in at least partial performance on the agreement. We do not view the lack of performance on some of the terms as dispositive of whether an agreement was reached. Further, we do not find that the subsequent correspondence between the parties serves to undermine evidence that the parties reached all of the essential terms of the sale during the December 20, 1993 meeting. As noted, the magistrate made a finding, based upon the credibility of the witnesses, that appellant accepted the terms of the agreement but then later refused to sign because he changed his mind and sought more favorable terms. Given this determination, we do not find that evidence that appellant proposed new terms after the agreement had been reached, over matters previously agreed upon, had the effect of reopening the agreement or preventing its enforcement.
 {¶ 66} Upon review, we conclude that substantial, credible evidence was presented to support the trial court's adoption of the magistrate's finding that the parties manifested intent to enter into an enforceable agreement. Further, there was evidence presented to support the magistrate's findings that appellee was willing to perform on the agreement but that appellant engaged in conduct designed to impede appellee and to block the liquidation and sale of the assets.
 {¶ 67} Appellant asserts that, even if an agreement was entered, the trial court erred in finding that the agreement complied with the Statute of Frauds. Appellant asserts that an agreement such as the one in the instant case, involving the sale of goods[1] valued at $500 or greater, was required to be signed by the parties pursuant to R.C.1302.04(A).
 {¶ 68} R.C. 1302.04(A) states as follows:
 {¶ 69} "Except as otherwise provided in this section a contract for the sale of goods for the price of five hundred dollars or more is not enforceable by way of action or defense unless there is some writing sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker. A writing is not insufficient because it omits or incorrectly states a term agreed upon but the contract is not enforceable under this division beyond the quantity of goods shown in such writing."
 {¶ 70} In his decision on liability, the magistrate considered the issue of the applicability of R.C. Chapter 1302 to the proceedings. The magistrate noted that the agreement, as set forth in Exhibit H, involved the sale of certain assets, including the pharmaceutical and hospital supplies and other inventory, as well as furniture, fixtures and hospital equipment; the agreement also contemplated the sale of the name "MedVet," the assumption of certain liabilities, and the payment of certain corporate obligations.
 {¶ 71} The magistrate relied upon case law for the proposition that, if a mixed goods and services contract is involved, the test as to whether Uniform Commercial Code ("UCC") Article Two is applicable involves a consideration of the predominant factor and purpose of the contract. The magistrate framed the issue in the instant case as whether the predominant purpose of the contract was the sale of goods or the winding up of VHOCO, with the sale of goods incidental to the winding up because of a court order to liquidate all corporate assets. The magistrate concluded that, even though the agreement involved the sale of assets, and otherwise would have come under R.C. 1302.04, because the agreement was entered into in fulfillment of the court's order, the Statute of Frauds was inapplicable.
 {¶ 72} Appellee notes, and we agree, that, while appellant raised the issue of Statute of Frauds before the magistrate, appellant's objections to the magistrate's decision did not include an objection based on the magistrate's finding that the Statute of Frauds was inapplicable. Civ.R. 53(E)(3)(b) states that "[a] party shall not assign as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule." In construing Civ.R. 53, this court has held that "the failure to file objections to the magistrate's decision under Civ.R. 53(E)(3)(b) constitutes the waiver of the right to appellate review `of all but plain error.'" In re Montgomery (Oct. 28, 1999), Franklin App. No. 99AP-749, quoting Federal Property Mgt. v. Brown (June 25, 1999), Montgomery App. No. 17424.
 {¶ 73} As discussed above, in holding that the Statute of Frauds did not apply in the instant case, the magistrate relied on a line of cases that examine the predominant purpose of the contract in determining the applicability of the sales provisions of UCC Article Two as codified in R.C. Chapter 1302. In general, "Ohio courts apply the predominant purpose test to mixed contracts to determine whether the predominant purpose of the contract is for the sale of goods." Ankle Foot Care Centers v. Infocure Systems, Inc. (N.D.Ohio. 2001), 164 F. Supp.2d 953. See, also, Allied Erecting Dismantling Co. v. Auto Bailing Co. (1990), 69 Ohio App.3d 502. Thus, "the test for the inclusion in or the exclusion from [R.C. Chapter 1302] sales provisions is whether the predominant factor and purpose of the contract is the rendition of service, with goods incidentally involved, or whether the contract is for the sale of goods, with labor incidentally involved." Allied Indus. Serv. Corp. v. Kasle Iron Metals (1977), 62 Ohio App.2d 144, 147.
 {¶ 74} Here, we find no error with the magistrate's determination that the predominant purpose of the oral agreement was not for the sale of goods. In the present case, the agreement at issue arose out of the court's December 6, 1993 order to dissolve the corporations, based upon the finding that the directors were deadlocked in the management of corporate affairs. The trial court's order provided for appellant and appellee, as directors, to wind up the affairs of the corporations and to liquidate all corporate assets. The parties' subsequent agreement, as memorialized and admitted at trial as Plaintiff's Exhibit H, specifically gives recognition to the court's "Judgment of Judicial Dissolution * * * entered on December 6, 1993," and the court's order to "wind up the affairs of the corporations * * * and to act promptly to liquidate all corporate assets and resolve all corporate liabilities."
 {¶ 75} While the label contracting parties affix to an agreement "is not necessarily determinative of the agreement's predominant purpose, it can constitute potent evidence of that purpose." Ross-Simmons of Warwick, Inc. v. Baccarat, Inc. (C.A. 1, 1996), 102 F.3d 12, 17
(section of agreement reiterating that parties executed agreement to compromise and settle matters involved in antitrust dispute provided evidence that primary impetus for agreement was to abate pending litigation). In the present case, the magistrate considered the meeting of the parties on December 20, leading to the oral agreement, in the context of the court's December 6 order. Upon review, we agree that the predominant purpose of the agreement was to facilitate the court's order to wind up the affairs of the corporations, liquidate the assets and resolve corporate liabilities. Accordingly, although not properly raised as an objection to the magistrate's decisions on liability, appellant's contention that the agreement is barred under that statute is not persuasive.
 {¶ 76} Based upon the foregoing, appellant's first and second assignments of error are without merit and are overruled.
 {¶ 77} Appellant's third and fourth assignments of error are interrelated and will be considered together. Under the third assignment of error, appellant argues that the trial court erred in finding that he breached a fiduciary duty, and in finding that appellee was entitled to bring individual, rather than derivative, claims. Under the fourth assignment of error, appellant contends the court rendered inconsistent decisions on the claims of the parties, holding that appellee could bring direct claims while utilizing the same legal standard to dismiss appellant's direct claims.
 {¶ 78} In general, Ohio places a "heightened fiduciary duty" between majority and minority shareholders in a close corporation. Morrison v. Gugle (2001), 142 Ohio App.3d 244, 254-255. Further, "this court has imposed the heightened fiduciary duty in cases where the actors are equal shareholders." Id. at 255, citing McLaughlin v. Beeghly (1992), 84 Ohio App.3d 502.
 {¶ 79} In the present case, the magistrate found that appellant breached his fiduciary duty to appellee by failing to comply with the court's order to wind up the corporations by attempting to block the liquidation and sale of assets, and converting assets to his own use. Regarding appellant's actions, the magistrate found that appellant "sought an additional premium from [appellee] before he would go on his way," an action "not consistent with fulfilling the Court's order to timely wind up the businesses." The trial court agreed with the magistrate that, while appellee attempted to discharge his responsibility for winding up the corporations' affairs, he was impeded by appellant's conduct. Under review, we find no error with the trial court's determination that appellant's actions in failing to assist in the winding up and liquidation of the corporations amounted to a breach of fiduciary duty.
 {¶ 80} We also disagree with appellant's contention that the court erred in allowing appellee to recover personally on the claims for breach of fiduciary duty where, it is asserted, such claims belonged to the corporations. In Crosby v. Beam (1989), 47 Ohio St.3d 105, 107, the Ohio Supreme Court noted the distinction between a direct cause of action and a derivative action as follows:
 {¶ 81} "A shareholder's derivative action is brought by a shareholder in the name of the corporation to enforce a corporate claim. Such a suit is an exception to the usual rule that a corporation's board of directors manages or supervises the management of a corporation. A derivative action allows a shareholder to circumvent a board's refusal to bring a suit on a claim. On the other hand, if the complaining shareholder is injured in a way that is separate and distinct from an injury to the corporation, then the complaining shareholder has a direct action. * * * "
 {¶ 82} In Crosby, supra, at 109, the court held that, in the context of an action for breach of fiduciary duty against a shareholder in a close corporation, a derivative remedy might not be effective "because the wrongdoers would be the principal beneficiaries of the recovery." Thus, in such cases in which the minority shareholder is individually harmed, a suit by a minority shareholder against the controlling shareholder may proceed as a direct action." Id. See, also, Medina, M.D. v. Perumbeti, M.D. (Dec. 22, 1994), Cuyahoga App. No. 66732 ("when a shareholder claims that he has sustained injuries which are not in common with other shareholders, he may bring an individual action rather than a derivative action").
 {¶ 83} As previously noted, appellee and appellant were both 50 percent shareholders in the corporations, and appellee sought damages in part on the theory that appellant breached a fiduciary duty owed directly to him by failing to assist with the dissolution and winding up the affairs of the corporations. Under the circumstances of this case, the usual concerns that generally preclude a shareholder from bringing an individual action are not present, and the court did not err in allowing appellee to bring this claim directly.
 {¶ 84} Appellant also contends the trial court erred in holding that appellee could bring direct claims while utilizing the same legal standard to dismiss appellant's direct claims. More specifically, appellant argues that, on September 18, 1998, appellee filed a motion for summary judgment in which appellee argued that appellant's verified claims belonged to the corporations, and thus should have been brought in a derivative suit. Appellant argues that the trial court adopted appellee's argument in its decision rendered on December 1, 1998, taking a strict interpretation of Crosby, supra. Subsequently, on March 31, 1999, appellant filed a motion for leave to file a motion for summary judgment, similarly arguing that the direct claims brought by appellee should have been brought as derivative claims. The trial court ultimately denied appellee's motion for leave to file the motion. Appellant argues that the trial court's later ruling that appellee's direct action was permitted violated the "law of the case" doctrine. Appellant also contends that it was inequitable for the court to have ruled one way as to appellee's direct claims and to have ruled in a different manner as to appellant's claims.
 {¶ 85} In response, appellee argues that the issue as to whether appellant's claims may have been derivative in nature arose only in connection with one of appellant's claims, alleging unauthorized use of corporate assets. Appellee contends that the trial court, in its December 1, 1998 decision, granted summary judgment on appellant's "verified claims" on the basis that it had been "decided by the Court's previous decisions and entries in this case and so are barred by res judicata." (Decision of trial court, Dec. 1, 1998.) Appellant notes that the court's decision did not otherwise address the issue of direct claims versus derivative claims.
 {¶ 86} A review of the record supports appellee's contention that the primary basis for the trial court's December 1, 1998 decision to grant summary judgment in favor of appellee on appellant's claim for unauthorized use of corporate assets was because it had previously addressed the issue. Specifically, in the court's earlier decision filed on May 6, 1997, the court rejected appellant's claim, finding that "the assets used as security for the Society notes were ultimately under the control of the Court, were administered by the Receiver, and were indeed used to pay the balance due on the notes." (Decision of trial court, May 6, 1997.) Based upon the record presented, we find unpersuasive appellant's contention that the court committed reversible error by its rulings.
 {¶ 87} Accordingly, appellant's third and fourth assignments of error are without merit and are overruled.
 {¶ 88} Under the fifth assignment of error, appellant contends the trial court erred in finding appellant was personally liable for the liabilities of the corporations without piercing the corporate veil. Appellant cites to the Ohio Supreme Court's three-part test in determining when to pierce the corporate veil, as set forth in Belvedere Condominium Unit Owner's Assn. v. R.E. Roark Cos., Inc. (1993), 67 Ohio St.3d 274.
 {¶ 89} We find appellant's reliance upon Belvedere to be inapplicable to the facts of this case. Under Ohio law, a corporate officer can be held personally liable for tortious acts he or she has committed and, under such circumstances, "plaintiffs need not pierce the corporate veil" to hold individuals liable who have personally committed such acts. Yo-Can, Inc. v. The Yogurt Exchange, Inc., 149 Ohio App.3d 513,2002-Ohio-5194, at ¶ 49. As explained by the court in Donsco, Inc. v. Casper Corp. (C.A. 3, 1978), 587 F.2d 602, 606, where a corporate officer is individually liable for torts personally committed, this liability "is distinct from the liability resulting from the `piercing of the corporate veil' as that term is commonly used." Rather, "[t]he rationale for piercing the corporate veil is that the corporation is something less than a bona fide independent entity." Id. Under the facts of Donsco, the court held that the liability of the corporate officer who participated in the wrongful act "is in no way dependent on a finding that [the corporation] is inadequately capitalized, that the corporation is a mere alter ego of [the officer], that the corporate form is being used to perpetrate a fraud, or that corporate formalities have not been properly complied with." Id. Thus, "the absence of such findings does not affect the individual officers' liability." United States ex rel. Haskins v. Omega Institute, Inc. (D.N.J. 1998), 11 F. Supp.2d 555, 565.
 {¶ 90} Similarly, in the instant case, it was unnecessary for appellee to pierce the corporate veil in order to impose personal liability on appellant. See, e.g., In re Harper (E.D.Tenn. 1993),150 B.R. 416, 419 (focus of fiduciary duty and resulting liability "is upon the actor responsible for the act rather than the corporate form"; thus, actor is personally liable for tortious injury committed "without taking into account a piercing of the corporate veil").
 {¶ 91} Appellant's fifth assignment of error is not well-taken and is overruled.
 {¶ 92} Under his sixth assignment of error, appellant argues the trial court erred in allowing several legal actions to occur in the course of a special statutory proceeding. More specifically, appellant contends the court erred in permitting appellee and appellant, as well as various third-party claimants, to file claims for redress of civil wrongs as part of the dissolution proceedings. Appellant raised this issue in a motion to dismiss for lack of subject-matter jurisdiction, filed with the trial court on July 7, 2000, which the court ultimately dismissed. Appellant maintains that the trial court failed to properly distinguish between a "civil action" and a "special proceeding," such as that under R.C. Chapter 1701. We disagree.
 {¶ 93} R.C. 1701.91(C) states as follows:
 {¶ 94} "Upon the filing of a complaint for judicial dissolution, the court with which it is filed shall have the power to issue injunctions, to appoint a receiver with such authority and duties as the court from time to time may direct, to take such other proceedings as may be necessary to protect the property or the rights of the complainants or of the persons interested, and to carry on the business of the corporation until a full hearing can be had. Upon or after the filing of a complaint for judicial dissolution, the court, by injunction or order, may stay the prosecution of any proceeding against the corporation or involving any of its property and require the parties to the proceeding to present and prove their claims, demands, rights, interests, or liens, at the time and in the manner required of creditors or others. * * *"
 {¶ 95} R.C. 1701.89(A) states in part:
 {¶ 96} "* * * [T]he court of common pleas * * * upon the complaint of the corporation, a majority of the directors, or a creditor or shareholder, and upon such notice to all the directors and such other persons interested as the court considers proper, at any time may order and adjudge in respect of the following matters:
 {¶ 97} "(1) The presentation and proof of all claims and demands against the corporation and of all rights, interests, or liens in or on any of its property; * * *
 {¶ 98} "* * *
 {¶ 99} "(3) The settlement or determination of all claims of every nature against the corporation or any of its property; the determination of the assets required to be retained to pay or provide for the payment of such claims or any claim; the determination of the assets available for distribution among shareholders; and the making of new parties to the proceeding so far as the court considers proper for the determination of all matters."
 {¶ 100} In the present case, appellant filed a motion to intervene in the judicial dissolution action, and the court granted his request to become a party to the action. As noted by appellee, the trial court set an order designating a cutoff date for the filing of claims, and appellant was the first party to take advantage of the claims' order by filing his verified claim against VHOCO, MedVet and appellee. Further, the claims all arose out of the underlying dissolution action. R.C.1701.91(C) permits the trial court to "take such other proceedings as may be necessary to protect the property or the rights of the complainants or of the persons interested," and to "require the parties to the proceeding to present and prove their claims, demands, rights, interests, or liens * * *." We conclude that the claims at issue were presented pursuant to the trial court's authority.
 {¶ 101} In so holding, we find the cases relied upon by appellant to be inapposite, as the claims asserted in those cases were against non-parties to the action. Thus, in Lioi v. Safturf Int'l Ltd., Inc. (June 25, 2001), Stark App. No. 2000CA00333, the court held that the trial court was without jurisdiction to order a contempt against appellant because appellant had not been served with summons and complaint. The court observed that "appellant should have been named and served as a party in the underlying judicial dissolution action." The court in Lioi relied upon a case cited by appellant in the instant case, Rundell v. Batch (1931), 42 Ohio App. 204, noting that the Rundell court "found that when a receiver wished to perfect claims for assets of a corporation against non-parties, the receiver is required to file independent suit against the holders of a corporation's assets." (Emphasis added.) The final case cited by appellant, In re Dissolution of Standard Corp. of Wapakoneta (1958), 106 Ohio App. 506, also involved a non-party (creditor), and the court specifically noted that no claim had been made against the creditor.
 {¶ 102} Appellant's sixth assignment of error is without merit and is overruled.
 {¶ 103} Under his seventh assignment of error, appellant argues the trial court erred in denying his motion for reconsideration of the judgments entered against him immediately preceding Judge Johnson's recusal for conflict of interest.
 {¶ 104} By way of background, on July 26, 2001, appellant filed a "second affidavit of disqualification of Franklin County Common Pleas Court Judge David L. Johnson." Counsel for appellant filed an affidavit, in which he averred that he was present during a conference call with Judge Johnson and another attorney, at which time Judge Johnson "disclosed to us that a girlfriend of his son's worked for the Plaintiff William D. DeHoff or for the veterinarians at the `MedVet' facility on Cleveland Avenue in Columbus, Ohio." Counsel further averred that "[t]he public perception is that this relationship where his adult son is actually living under the same roof as Ms. Bancroft and who is employed by the veterinary facility that is the subject matter of the litigation with the Plaintiff * * * gives the appearance of bias or impropriety or potential conflict of interest." Judge Johnson subsequently recused himself from the case, while denying any bias or prejudice.
 {¶ 105} On August 28, 2001, appellant filed a "motion for reconsideration of decision by Judge Johnson rendered May 29, 2001, and all decisions rendered by Judge Johnson after July 3, 2001." By entry filed September 5, 2001, the trial court denied appellant's motion.
 {¶ 106} Appellant argues that all decisions rendered by Judge Johnson following the conduct giving rise to his recusal should have been reconsidered as a matter of procedure, as well as in the interest of fairness, justice and impartiality. We find no merit to appellant's argument.
 {¶ 107} The record indicates that, on July 19, 2001, Judge Johnson filed an affidavit, averring that his adult son has a girlfriend who he lives with, and that the girlfriend "works for MedVet, in what capacity I am uncertain." The affidavit further states:
 {¶ 108} "She tells me that she has worked there for about three years.
 {¶ 109} "Sometime earlier on I asked her about her job. I knew she worked in some kind of veterinary facility or practice.
 {¶ 110} "I asked her the names of veterinarians in her office. One of those named was William DeHoff. I assumed, therefore, the office was MedVet. I made a conference call to both sides (I believe I spoke with Rick Brunner and Jonathon Stock) and shared the information with them. (I don't believe I said that they lived together.)
 {¶ 111} "Ms. Bancroft and I have not spoken of this case, nor have I spoken with anyone else other than counsel and my staff. I am persuaded that she does not know this case exists.
 {¶ 112} "However, I made one mistake. About a year ago, my son Chad's dog had been on the losing end of a fight with a raccoon and had a puncture wound on its paw. My wife called Ms. Bancroft, at her home and left a message, asking her to stop by our house. She did and cleaned out the wound with soap.
 {¶ 113} "I told Ms. Bancroft I wanted a bill for the cleaning materials. I did not receive a bill and I failed to follow through."
 {¶ 114} Thus, the trial judge acknowledged that his son had a living arrangement with an employee of MedVet, but he denied that this influenced any judicial determination. Although the trial judge ultimately recused himself to avoid any appearance of bias, nothing in the record suggests that the judge's interaction with his son's girlfriend had anything to do with the issue in this case, and we find the allegation of bias to be merely speculative. Further, this court's review of the record does not indicate that the trial court showed bias during the proceedings, nor has appellant pointed to any actual evidence of bias. To the extent that appellant may have been disappointed by adverse rulings during the trial, "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." Liteky v. United States (1994), 510 U.S. 540, 555, 114 S.Ct. 1147. Rather, "[a]lmost invariably, they are proper grounds for appeal, not for recusal." Id. In the present case, we find no abuse of discretion by the trial court in denying appellant's motion for reconsideration.
 {¶ 115} Accordingly, appellant's seventh assignment of error is overruled.
 {¶ 116} Under his eighth assignment of error, appellant asserts the trial court erred in finding that appellant owed $10,000 pursuant to the December 21, 1993 agreement. In his objections to the magistrate's decisions, appellant argued that he was entitled to a set-off regarding the $10,000 amount he was to pay under the agreement, based upon the following language of the draft agreement:
 {¶ 117} "Harrison agrees to contribute the sum of $10,000 to VHOCO for payment of current liabilities, including professional fees to veterinarians employed by VHOCO. Such payment shall be computed, collected and paid to VHOCO as follows: $4,771.35 from fees earned in November, 1993 by Harrison for professional services rendered at the CWVEG facilities in Cleveland, the receipt of which is acknowledged by VHOCO; * * *. To the extent that such fees collected and deposited by VHOCO by January 10, 1994 are less than $10,000, DeHoff shall promptly advise Harrison, and Harrison shall pay to VHOCO the difference between the amount collected and $10,000, on or before 3:00 p.m. on Friday, January 14, 1994."
 {¶ 118} As noted by appellee, under this assignment of error, appellant does not challenge or discuss the trial court's equitable subordination order. However, in the receiver's report and application, filed May 24, 1996, the receiver, based upon an investigation of the claims of creditors, made application that the insider shareholder claims be equitably subordinated to the general claims of the creditors. The trial court, by decision filed July 17, 1996, addressed this issue, holding in relevant part:
 {¶ 119} "The receiver seeks to have the claims of the insider-shareholders [appellee and appellant] be equitably subordinated to the general claims for rent, professional fees, and accounting services. In light of the limited funds available for distribution to the creditors, this request is justified. Thus, the insider-shareholders' claims are equitably subordinated to the general claims."
 {¶ 120} Following the magistrate's decisions on liability and damages, finding in part that appellant had failed to pay the $10,000 obligation set forth under the agreement, appellant, in his objections to the magistrate's decisions, argued that he was entitled to a set-off under the agreement for fees earned in November 1993.
 {¶ 121} In its decision overruling appellant's objections to the magistrate's decisions, the trial court held:
 {¶ 122} "In this regard, defendant was obligated to pay $10,000 under the Agreement. The Magistrate determined that defendant has not paid this amount. * * * Although the Agreement permitted defendant to set-off professional fees which he earned but were collected by VHOCO, the September 10, 1996 entry equitably subordinated both plaintiff's and defendant's claims to the claims of other creditors. Also, because defendant has breached this Agreement, the Magistrate properly included the $10,000 in the compensatory-damages award. Thus, defendant is not entitled to set-off."
 {¶ 123} Here, while the trial court recognized that the agreement would have entitled appellant to a set-off, the court further noted that the claims of the insider-shareholders had been subsequently subordinated to the claims of the creditors. Further, implicit in the trial court's analysis was the fact that the claims of the shareholders were subordinated, in part, as a result of appellant's failure to comply with the agreement.
 {¶ 124} The right to a set-off is an equitable concept, and the allowance of a set-off is a matter within the discretion of the trial court. Webster v. Dalcoma Ltd. Partnership Four (Sept. 17, 2001), Fayette App. No. CA2000-11-028. In New Dimensions Products, Inc. v. Flambeau Corp. (1993), 17 Kan. App. 2d 852, 844 P.2d 768, the appellant breached its agreement with appellee, withholding royalty payments under the agreement and failing to establish an account required by the agreement. The trial court denied appellant's claim for set-off and the appellate court affirmed, holding that appellant was not a candidate for equitable relief and finding no error by the trial court in refusing to provide appellant relief under the doctrine of set-off. Under the circumstances of the instant case, including the trial court's findings of breach of agreement, breach of fiduciary duty and bad faith on the part of appellant, we are unable to conclude that the trial court abused its discretion in denying appellant's claimed entitlement to a set-off.
 {¶ 125} Appellant's eighth assignment of error is not well-taken and is overruled.
 {¶ 126} Under his ninth assignment of error, appellant contends the trial court erred in awarding $50,000 in compensatory damages to appellee for loss of time and storage of documents. Appellant maintains that the corporate dissolution statutes do not provide a party reimbursement for expenses for time spent in litigating the matter and storage of documents. Appellant further argues that such damages constitute special damages, which must be specifically pled. Finally, appellant argues that the magistrate and trial court did not sufficiently explain the damages awarded.
 {¶ 127} General damages have been defined as those damages that "naturally and necessarily result from a wrongful act and which are directly traceable to, and the probable and necessary result of, injury caused by that act." Homes By Calkins, Inc. v. Fisher (1993),92 Ohio App.3d 262, 267. In contrast, "`special damages' are damages of such a nature that they do not follow as a necessary consequence of the injury complained of * * * though they may in fact naturally flow from that injury." Id.
 {¶ 128} A review of the objections to the magistrate's decisions indicates that appellant did not raise issues regarding whether there existed statutory authorization for the damages, or whether such damages should have been pled as special damages under Civ.R. 9(G). Further, as noted by appellee, Civ.R. 15(B) states in part: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings." Pursuant to Civ.R. 15(B), "a party impliedly consents to litigate an issue if he does not specifically object to the introduction of the evidence." Thyer v. Big Hill Realty, Inc. (Aug. 27, 1981), Montgomery App. No. CA 6989. In the instant case, appellant did not object to the testimony before the magistrate regarding loss of time and storage expenses, and the magistrate heard evidence presented by appellee as to those issues. Because the issue was tried by express or implied consent of the parties, the issue will be treated as if it had been raised in the pleadings. Ford v. Tandy Transp., Inc. (1993),86 Ohio App.3d 364, 381. See, also, Thyer, supra (counsel waived any objection and impliedly consented to the introduction of testimony and exhibits in connection with evidence of special damages).
 {¶ 129} Appellee maintains that appellant has mischaracterized the award of loss of time as an award of litigation expenses. Appellee argues that the damages at issue were not caused by the litigation between these parties; rather, these costs were incurred as a result of performing duties imposed on appellee by the court's order of December 6, 1993, as well as responding to other claims that arose due to appellant's breach of fiduciary duty, and preserving the property and records of the corporations in liquidation.
 {¶ 130} During the 1999 hearing, appellee testified that, since January 1, 1994, he had expended an average of four to five hours per month on matters relating to the liquidation and winding up of the corporations, including inventorying drugs, reviewing records, taking care of furniture and computer equipment, and making sure employees were paid. Appellee stated that those matters took away from time he could have spent on his practice. Appellee also testified that, as a result of appellant's failure to comply with the agreement, he incurred expenses for storage of records and hiring individuals to maintain those records. Appellee testified that he could "conservatively * * * justify $25,000 a year loss to the hospital and just to the energies that this lawsuit has generated." (Tr., Vol. I, at 174.)
 {¶ 131} We agree with appellee's contention that the damages sought do not involve what would normally be characterized as litigations costs; rather, these damages were related to lost time and expenses incurred as a direct result of appellant's failure to assist in the winding up and liquidation of the corporations. See, e.g., Cunningham v. Healthco, Inc. (C.A. 5, 1987), 824 F.2d 1448, 1462 (award of $25,000 in breach of contract case affirmed where appellee presented testimony that he spent time trying to arrange staffing, financing, equipment leases, advertising and other necessities, and that these management functions prevented him from practicing dentistry and earning dental fees). Further, in the present case, appellant did not cross-examine appellee on the reasonableness of the claimed damages, or the manner in which they were calculated, nor did appellant present evidence to refute these expenses or to show that they were unnecessary. While the magistrate awarded appellee less than the damages alleged, the magistrate nonetheless found appellee's testimony to be credible regarding the effects of appellant's conduct. The trial court, in reviewing the award, found that appellant had not demonstrated that the magistrate improperly awarded appellee damages for the time related to the fallout created by appellant "not living up to the December 1993 Agreement." Upon review, we find that the trial court sufficiently specified its reasons for the award and that the unrebutted testimony provided a sufficient basis to support the damages award.
 {¶ 132} Accordingly, appellant's ninth assignment of error is overruled.
 {¶ 133} Under the tenth assignment of error, appellant argues the trial court erred in awarding attorney fees where, it is asserted, the court did not provide a clear explanation of its reasons for the award and where no legal basis existed to support the award.
 {¶ 134} The trial court, in overruling appellant's objections to the magistrate's decisions awarding attorney fees, held in part that "attorney fees may be awarded as compensatory damages for [appellant's] breach of the Agreement and breach of fiduciary duty." The court further noted in its decision that, "although the Magistrate declined to award punitive damages, he found that defendant acted in bad faith. As such, attorney fees may be awarded as compensatory damages in the absence of a punitive-damage award."
 {¶ 135} In general, Ohio follows the "American Rule," whereby a prevailing party may not recover attorney fees in the absence of a statute permitting such an award. Brown v. Guarantee Title Trust/ARTA (Aug. 28, 1996), Fairfield App. No. 94-41. We will first address appellant's contention that the trial court erred in awarding attorney fees based upon breach of the agreement. There are exceptions to the American Rule, and this court has previously held that the rule does not prevent a party from recovering attorney fees as compensatory damages resulting from a breach of contract. Shanker v. Columbus Warehouse Ltd. Partnership (June 6, 2000), Franklin App. No. 99AP-772. In Shanker, the defendant did not seek attorney fees as costs of the action, but rather as compensatory damages "flowing from plaintiffs' breach" of a settlement agreement. Id. This court held that, "[w]hen a party breaches a settlement agreement to end litigation and the breach causes a party to incur attorney fees in continuing litigation, those fees are recoverable as compensatory damages in a breach of settlement claim." Id.
 {¶ 136} In the instant case, the trial court, in holding that attorney fees could be awarded as compensatory damages for breach of the agreement, relied upon this court's holding in Shanker, supra. Appellant argues that the Shanker case is distinguishable from the instant case in that Shanker involved a settlement agreement entered by the parties with the intention of resolving all litigation among the parties. Appellant argues that the instant case did not involve a settlement agreement designed to dismiss the underlying dissolution agreement, nor did appellee in the instant case file a motion to enforce a settlement agreement. Upon review, we agree with appellant that the holding in Shanker is limited to circumstances involving settlement agreements entered to end litigation, and we further agree that the facts of the instant case are distinguishable. Accordingly, we find that the trial court erred in awarding attorney fees as compensatory damages resulting from breach of the agreement.
 {¶ 137} As noted, the magistrate and trial court also found that attorney fees were warranted based upon appellant's breach of fiduciary duty in thwarting the order of the trial court to dissolve the corporations. In McLaughlin, supra, this court upheld the award of attorney fees in an action for breach of fiduciary duty against a shareholder in a close corporation. This court noted that in the typical case, "a shareholder's action is complicated and costly to pursue," and "[t]he inability to award attorney fees, under the proper circumstances, would stifle the legitimate exercise of a minority shareholder's right to enforce the fiduciary duty owed to him by the controlling shareholder." Id. at 508. Thus, this court found no abuse of discretion in the trial court's award of fees. Further, under the facts of McLaughlin, the trial court made no finding of malice, but nevertheless held that the trial court did not abuse its discretion in awarding attorney fees. In the present case, where there was a finding that appellant acted in a manner designed to impede appellee's duties as a 50-percent shareholder and thwart the winding up and liquidation of the corporations, we find that the trial court did not abuse its discretion in awarding attorney fees for breach of fiduciary duty.
 {¶ 138} Accordingly, appellant's tenth assignment of error is sustained to the extent that the trial court erred in awarding attorney fees as compensatory damages for breach of the agreement, but is overruled as to the trial court's decision to award fees based on breach of fiduciary duty.
 {¶ 139} Under his eleventh assignment of error, appellant argues the trial court abused its discretion in awarding attorney fees that were substantially greater than appellee's actual damages. Appellant also contends the trial court failed to apply the factors contained in DR 2-106, and that the court awarded attorney fees for work performed on behalf of persons other than appellee.
 {¶ 140} Appellant, citing Bittner v. Tri-County Toyota, Inc. (1991), 58 Ohio St.3d 143, argues that a trial court abuses its discretion when it awards attorney fees so high as to "shock the conscience." Appellant maintains that, in the instant case, the amount of attorney fees awarded was so disproportionate to appellee's damages as to require this court to grant relief.
 {¶ 141} In arguing that the fees awarded were disproportionate to the damages, appellant argues that much of the compensatory damages, i.e., the award of $50,000, was improperly allowed. However, we rejected appellant's contention on this issue in addressing his ninth assignment of error. Further, cases cited by appellant do not support the notion that attorney fees must be mathematically proportionate to the amount of compensatory damages. For instance, in Bittner, supra, the Ohio Supreme Court rejected the contention that the amount of attorney fees awarded under the statute must bear a direct relationship to the amount of the settlement. The court cited with approval a United States Supreme Court decision, Riverside v. Rivera (1986), 477 U.S. 561, 106 S.Ct. 2686, in which that court noted the practical difficulties posed by a rule of proportionality.
 {¶ 142} In the Bittner case, involving an award of attorney fees under R.C. 1345.09, pertaining to the Consumer Sales Practices Act, the court further held that, when awarding reasonable attorney fees pursuant to that statute, "the trial court should first calculate the number of hours reasonably expended on the case times an hourly fee, and then may modify that calculation by application of the factors listed in DR 2-106(B)." Id. at 145. Those factors, as set forth in Bittner, supra, at 145-146, are:
 {¶ 143} "[T]he time and labor involved in maintaining the litigation; the novelty and difficulty of the questions involved; the professional skill required to perform the necessary legal services; the attorney's inability to accept other cases; the fee customarily charged; the amount involved and the results obtained; any necessary time limitations; the nature and length of the attorney/client relationship; the experience, reputation, and ability of the attorney; and whether the fee is fixed or contingent."
 {¶ 144} Appellant contends the trial court failed to consider the applicability of DR 2-106(B) to the instant proceedings. As noted by appellee, however, appellant did not, in his objections to the magistrate's decisions, raise this issue. By failing to raise this issue before the trial court in objections to the magistrate's decisions, appellant has waived appeal of that issue. State ex rel. Booher v. Honda of Am. Mfg., Inc. (2000), 88 Ohio St.3d 52, 53-54 ("Civ.R. 53(E)(3)(b) prohibits a party from `assign[ing] as error on appeal the court's adoption of any finding of fact or conclusion of law unless the party has objected to that finding or conclusion under this rule' ").
 {¶ 145} A party seeking an award of attorney fees has the burden of demonstrating the reasonable value of such services. Davis v. Reed (June 20, 1996), Cuyahoga App. No. 68699. A trial court's determination as to attorney fees should not be reversed absent a showing that the court abused its discretion. Bittner, supra, at 146.
 {¶ 146} In the instant case, appellee's expert, Charles Saxbe, testified on the issue of attorney fees. Saxbe testified that he utilized the factors set forth under DR 2-106 "as they were applicable to the case," and he "attempted to apply each one of the factors." (Tr. May 4, 2000, at 372.) Saxbe deemed the time and labor required to represent appellee "substantial and necessary," and noted that the client "has been provided with statements which have thoroughly set forth the work performed." (Tr. May 4, 2000, at 378.) According to Saxbe, the work performed was appropriate because the litigation was lengthy and contentious, and he viewed the results obtained as satisfactory. He described the attorneys on both sides as "high caliber." (Tr. May 4, 2000, at 378.) Saxbe believed that the hourly rates were reasonable, and he opined that the work performed by appellee's counsel was reasonable, necessary and appropriate. Saxbe stated that, although the amount in controversy was not as great as the attorney fees being sought, "[t]hat is not necessarily a factor where you have litigation involving parties determined to prevail on principles that they espouse." (Tr. May 4, 2000, at 379.) In light of the number of years this litigation has taken, Saxbe found that it involved time that "probably would have been expended on other fee-earning activities." (Tr. May 4, 2000, at 379.) Saxbe described the relationship between client and counsel as good.
 {¶ 147} Again, while appellant contends that the magistrate failed to properly examine the factors under DR 2-106, appellant failed to raise this issue before the trial court. However, the record clearly indicates that evidence as to those factors was presented at the hearing through the testimony of Saxbe.
 {¶ 148} Appellant also contends the trial court erred in awarding some fees for work performed on behalf of the claimants instead of appellee. Appellant does not specifically set forth what fees were improper, but rather contends generally in his appellate brief that there were "numerous instances" where appellee's counsel billed for work performed for claimants, and that these fees were substantial. A review of the magistrate's decision indicates that the magistrate addressed a number of objections to fees, including some purported to have been part of a separate 1996 case, and some purported to have been on behalf of other individuals besides appellant. The record indicates that the magistrate deducted a number of amounts from the award of fees. Appellee acknowledges that during the proceeding he joined in a claimant's motion for summary judgment, and filed an affidavit in support. However, to the extent that segregation of fees may not be practical because the facts are intertwined, and where the record shows the court attempted to do so when practicable, we are unable to say that the trial court abused its discretion.
 {¶ 149} Appellant's eleventh assignment of error is not well-taken and is overruled.
 {¶ 150} Under his twelfth assignment of error, appellant contends the trial court erred in awarding prejudgment interest. Appellant raises various contentions, including the argument that prejudgment interest may not be awarded on attorney fees under Ohio law.
 {¶ 151} In the present case, the trial court awarded prejudgment interest under both R.C. 1343.03(A) and (C). R.C. 1343.03 states in pertinent part:
 {¶ 152} "(A) In cases other than those provided for in sections1343.01 and 1343.02 of the Revised Code, when money becomes due and payable upon any bond, bill, note, or other instrument of writing, upon any book account, upon any settlement between parties, upon all verbal contracts entered into, and upon all judgments, decrees, and orders of any judicial tribunal for the payment of money arising out of tortious conduct or a contract or other transaction, the creditor is entitled to interest at the rate of ten per cent per annum, and no more, unless a written contract provides a different rate of interest in relation to the money that becomes due and payable, in which case the creditor is entitled to interest at the rate provided in that contract.
 {¶ 153} "* * *
 {¶ 154} "(C) Interest on a judgment, decree, or order for the payment of money rendered in a civil action based on tortious conduct and not settled by agreement of the parties, shall be computed from the date the cause of action accrued to the date on which the money is paid if, upon motion of any party to the action, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case."
 {¶ 155} It has been noted that, "the underpinning of prejudgment interest awards is to encourage prompt settlement of claims, prevent prolonged litigation, and to compensate and make the injured party whole." Advanced Technology Incubator, Inc. v. Manning, Portage App. No. 2001-P-0154, 2003-Ohio-2537, at ¶ 25. A determination to grant prejudgment interest rests within the trial court's sound discretion, and a court's finding on this issue will not be reversed absent a clear abuse of discretion. Luft v. Perry County Lumber Supply Co., Franklin App. No. 02AP-559, 2003-Ohio-2305.
 {¶ 156} In Kalain v. Smith (1986), 25 Ohio St.3d 157, 159, the Ohio Supreme Court held that "[a] party has not `failed to make a good faith effort to settle' under R.C. 1343.03(C) if he has (1) fully cooperated in discovery proceedings, (2) rationally evaluated his risks and potential liability, (3) not attempted to unnecessarily delay any of the proceedings, and (4) made a good faith monetary settlement offer or responded in good faith to an offer from the other party."
 {¶ 157} In the present case, appellant notes that the trial court did not specify which portion of the prejudgment interest awarded to appellee was pursuant to R.C. 1343.03(A), and which portion was pursuant to R.C. 1343.03(C). While the trial court's entry only generally indicates that the court was granting prejudgment interest "under both divisions (A) and (C)" of R.C. 1343.03, we presume that the court's award under R.C. 1343.03(A) was for appellee's claim that appellant was obligated to pay the sum of $10,000 under the agreement. Appellee acknowledges this obligation is the only item of compensatory damages awarded based exclusively upon a breach of contract theory.
 {¶ 158} R.C. 1343.03(A) governs a trial court's award of prejudgment interest on claims arising out of breach of contract. Baldwin v. Rieger, Trumbull App. No. 2001-T-0106, 2002-Ohio-4368. Under R.C.1343.03(A), prejudgment interest is based upon the premise that a party to a contract should not retain the use of money owed under a contract when that amount is due and payable to the other contracting party. Perry Lumber, supra. Thus, it has been held that the trial court does not have discretion in awarding prejudgment interest under the statute. Baldwin, supra. Further, "[t]he existence of a good faith effort to settle is not a predicate for an award of prejudgment interest for breach of contract under R.C. 1343.03(A) as it is for tort claims under R.C. 1343.03(C)." Id., at ¶ 23. In the present case, because appellee was granted judgment on a contract claim in which the court found appellant was obligated to pay $10,000 under the agreement, appellee was entitled to prejudgment interest as to that amount under R.C. 1343.03(A).
 {¶ 159} We note that we have previously found the trial court erred in awarding attorney fees as compensatory damages for breach of the agreement. Thus, to the extent that the court's award of prejudgment interest includes interest on attorney fees for such breach, the award is not sustainable.
 {¶ 160} Appellant also challenges the trial court's award of prejudgment interest under R.C. 1343.03(C), regarding appellee's tort claim. In addressing appellant's tenth assignment of error, we held that the trial court did not abuse its discretion in awarding attorney fees for breach of fiduciary duty. The trial court made a further finding that appellant's conduct constituted bad faith, and the court treated the attorney fees as compensatory damages for amounts spent by appellee resulting from appellant's breach of fiduciary duty.
 {¶ 161} The Ohio Supreme Court has held that prejudgment interest in a civil action based on tortious conduct applies only to a compensatory damages award. Galmish v. Cicchini (2000), 90 Ohio St.3d 22,33. Under Ohio law, "[a]ttorney fees and costs may be awarded as an element of compensatory damages only if authorized by statute or if a jury finds that punitive damages are warranted." Meade v. Nat'l Bank of Adams County, Adams App. No. 02CA733, 2002-Ohio-5747, at ¶ 18. See, also, Vinci v. Ceraolo (1992), 79 Ohio App.3d 640, 649 ("[a]ttorney fees are recoverable as compensatory damages by a plaintiff in an action in which punitive damages are proper"); Czarnecki v. Basta (1996),112 Ohio App.3d 418, 425 ("[a]ttorney fees may be awarded as compensatory damages only where punitive damages have been found"). In the present case, although the trial court made a finding of bad faith, the court further determined that malice was not present, and therefore the court did not award punitive damages. Under these circumstances, where punitive damages are not warranted, and despite the trial court's characterization of the fees, we disagree that they are recoverable as "compensatory damages." Thus, even assuming that Ohio law allows prejudgment interest to be granted based upon an award of attorney fees as compensatory damages, we do not find that prejudgment interest was proper in the instant case as to the award of attorney fees for breach of fiduciary duty.
 {¶ 162} However, we find no abuse of discretion by the trial court in awarding prejudgment interest for compensatory damages arising out of appellant's breach of fiduciary duty that were not a component of attorney fees. The trial court conducted a hearing on the issue of prejudgment interest under R.C. 1343.03(C), and the court read its decision into the record on March 1, 2002. The court found that appellee met his burden of proof with respect to all four elements of the Kalain test and, upon review, we conclude that the court gave proper consideration to those factors and the court's findings were supported by evidence in the record.
 {¶ 163} Accordingly, appellant's twelfth assignment of error is sustained in part and overruled in part.
 {¶ 164} We will next address appellee's assignment of error on cross-appeal. Appellee argues that the trial court erred in failing to find that appellant acted with malice and in failing to enter an award of punitive damages. Appellee maintains the trial court correctly concluded that appellant acted in bad faith, but erred by failing to recognize that the same facts that establish appellant's bad faith also prove that appellant acted with actual malice.
 {¶ 165} The decision whether to award punitive damages is within the trial court's discretion and, absent an abuse of discretion, the court's ruling will be upheld. White Oak Communities, Inc. v. Russell (Nov. 9, 1999), Franklin App. No. 98AP-1563. Ohio law provides that an award of punitive damages is available only upon a finding of actual malice. Berge v. Columbus Community Cable Access (1999),136 Ohio App.3d 281, 316. The "actual malice" necessary for purposes of an award of punitive damages has been defined as "`(1) that state of mind under which a person's conduct is characterized by hatred, ill will or a spirit of revenge, or (2) a conscious disregard for the rights and safety of other persons that has a great probability of causing substantial harm.'" Id., quoting Preston v. Murty (1987), 32 Ohio St.3d 334, at syllabus.
 {¶ 166} In the instant case, in finding that appellant had not acted with malice, the magistrate specifically found that "the degree of hatred, ill-will, or spirit of revenge necessary to constitute actual malice, as set forth in Preston v. Murty is not present herein." (Mag. Decision, June 1, 2000, at 4.) In addressing appellee's objections to the magistrate's decisions, the court agreed with the magistrate's finding that the evidence supported a finding that appellant had acted in bad faith even though he did not act maliciously. The trial court noted that punitive damages are unavailable for vigorously pursuing a lawsuit and not cooperating with the other party. Thus, while the court found that appellee was entitled to compensatory damages, the court adopted the magistrate's finding of no actual malice, thereby precluding an award of punitive damages.
 {¶ 167} Appellee argues that the definitions of "bad faith" and "actual malice" under Ohio law actually "intersect and merge." Appellee further argues that the record supports an award of punitive damages based upon the following facts: (1) appellant did not want VHOCO and MedVet dissolved and liquidated despite agreeing to the order of the court requiring his cooperation; (2) appellant attempted to copy appellee's business strategy but was unsuccessful, thereby prompting further ill-will, malice and spite; and (3) after reaching an agreement, appellant decided he did not like the bargain he had struck, and thereafter decided to punish appellee.
 {¶ 168} At the outset, we disagree with appellee's contention that the concepts of bad faith and actual malice have effectively merged under Ohio law. See, e.g., CSS Publishing Co., Inc. v. Am. Economy Ins. Co. (2000), 138 Ohio App.3d 76, 86 ("[t]he conduct necessary to support an award of punitive damages is separate from that sufficient to establish bad faith. Punitive damages are recoverable in an action against an insurance company for breach of its duty of good faith * * * only upon proof of actual malice, fraud, or insult on the part of the insurer"), citing Hoskins v. Aetna Life Ins. Co. (1983), 6 Ohio St.3d 272; Furr v. State Farm Mut. Auto. Ins. Co. (1998), 128 Ohio App.3d 607, 621 ("a finding of bad faith does not automatically entitle an insured to punitive damages. Rather, an award of punitive damages requires a finding of actual malice"), citing Zoppo v. Homestead Ins. Co. (1994),71 Ohio St.3d 552, 557-558; Spalding v. Celebrezze (Sept. 3, 1998), Cuyahoga App. No. 70524 ("claims for mere breach of fiduciary duty, like * * * the simple tort of bad faith * * * do not per se warrant an award of punitive damages without a sufficient requisite finding of `actual malice' ").
 {¶ 169} Regarding appellee's argument that appellant acted out of ill-will, malice and spite as a result of his failure to successfully copy appellee's business strategy, we agree with appellant that there is a lack of evidence in the record to support this theory. Appellee also contends that appellant sought to punish appellee by not complying with the draft agreement. However, it has been noted that the law "`generally does not distinguish between good and bad motives for breaching a contract.'" Sorensen v. Wise Mgt. Servs., Inc., Cuyahoga App. No. 81627, 2003-Ohio-767. See, also, Burdock v. L.F.P., Inc. (Nov. 18, 1982), Franklin App. No. 82AP-3 ("[i]t is rare that breach of a contract can result in the award of punitive damages"). To the extent that appellee contends appellant acted maliciously in failing to work toward the trial court's order to wind up the corporations, we find that the record supports the trial court's finding of bad faith. However, it does not follow that the trial court was required to further conclude that appellant acted with the type of hatred, ill-will or spirit of revenge that is contemplated by actual malice, and we disagree with appellee's contention that bad faith is the equivalent of malice under Ohio law. Upon review, we are unable to conclude that the trial court abused its discretion in failing to award punitive damages.
 {¶ 170} Appellee's single assignment of error on cross-appeal is without merit and is overruled.
 {¶ 171} Based upon the foregoing, appellant's first, second, third, fourth, fifth, sixth, seventh, eighth, ninth, and eleventh assignments of error are overruled, appellant's tenth and twelfth assignments of error are sustained in part and overruled in part, and appellee's single assignment of error on cross-appeal is overruled. Accordingly, the judgment of the Franklin County Court of Common Pleas is affirmed in part and reversed in part, and this matter is remanded to that court for further proceedings in accordance with law and consistent with this opinion.
Judgment affirmed in part and reversed in part; cause remanded.
TYACK and LAZARUS, JJ., concur.
[1] Pursuant to R.C. 1302.01(A)(8), goods are defined as "all things * * * which are moveable at the time of identification to the contract for sale."